May it please the Court, Tripp Johnston of Federal Defenders, on behalf of Mr. Cota-Mora. Before, last night, I had an idea of what I was going to say, but I did come across something that I feel compelled to offer to this Court today, along with a request, two specific requests. As a matter of background, this case and the next case, which I'll be arguing on this calendar, are cases in which the government spike-stripped vehicles without any warning, leaving them disabled in the middle of the desert of Imperial County. Both the Court in Mr. Cota-Mora's case and the Court in Mr. Guzman-Padilla's case relied heavily on agent testimony about the safety of the spike-stripping device. And in particular, on the testimony of two agents. In this case, the agent was Mr. Vega-Torres. And as the government stated in their brief, Mr. Vega has been involved in the deployment of the spike-strip on about 150 occasions. And in all of those experiences, he has never seen an accident or rollover that was caused by this device. In the next case, Mr. Guzman-Padilla's, the government relied exclusively on the testimony of Officer Battaglini. And Mr. or Officer Battaglini testified that he personally deployed these devices 30 to 35 times and witnessed 60 to 70 other occasions. And to quote the government's brief, in none of these instances has he ever seen anyone injured as a consequence. Last night, in preparation for this argument, I came across a brief that was filed by the government in another case that preceded this case. A case in which had almost exactly the same facts, spike-stripping without any prior warning. And in that case, it turns out that Agent Vega, the agent in this case, and Agent Battaglini were involved in the spike-stripping of the vehicle. Actually, two vehicles at the same time. And to quote the government's brief, Agent Battaglini passed the vehicle on the highway and drove a mile and a half around the curve in the road. He stopped the vehicle and prepared to deploy the tire deflation device. He deployed the device when the vehicle was two car lengths away. The vehicle drove over the spikes and continued approximately 30 yards before swerving sharply to the left and the right and then rolling over. The driver of the vehicle was injured and was taken away by medical services. Quite simply, what was said in our hearings was untrue. I'd ask the Court to take judicial notice, which I believe it can even at this time, of these statements and admissions in the government's brief. The case number is 0850082, Rodriguez. That's the Rodriguez-Martinez case? That's correct, Your Honor. And again, I apologize. If I had come to this brief earlier, I certainly wouldn't be doing this today. I told Mr. Rahe as soon as I saw him this morning what I found. But because I think that there are serious Brady and Giglio issues about the failure of the government to provide this evidence before Mr. Cota's hearing in this case, and because it concerns issues that concern the district court and their decision-making significantly, I would ask this Court to defer submission and provide me a brief opportunity to research the issue and provide a brief of any other reasons for remand that I would think would be appropriate based on the strategy disclosed. I think it's Brady. Would the way this would play out, assuming that there's authority for it, is that before the legal issues presented by the appeal were determined here, that the case would go back for further factual findings by the district court? Is that how you see it playing out? Well, Your Honor, my position is, no, that this Court can decide this case in favor of Mr. Cota without having to go to the safety concerns, which I think rest primarily with whether this was an excessive use of force. My first argument, and if the Court accepts this, it need not get into this issue, is that this detention was an arrest, that it evolved to an arrest that was not supported by probable cause in this case. If the Court could reach that issue in favor of Mr. Cota, it wouldn't need necessarily to address the safety issue. But if it's a valid stop and it's not an arrest, or if there's probable cause, I guess it would be another way to get to the same result, then you get into the reasonableness of the force, and then we can't avoid the issue you've raised. That's correct, Your Honor. But I would be happy to brief this in advance so the Court has all of its options available. Mr. Johnson, I recall somewhere, either this case or the next one, one of the agents testified that there was one event in which there was a car turned over. And so it's – maybe they were referring to the Rodriguez-Martinez event. I don't know. I think that would be impossible, Judge Thompson, for two reasons. First, Agent Vega in this case was explicit in his testimony that the only reason why the vehicle wrecked that he was referring to, that you had just referred to, was because he had attempted to avoid the spike strip before he got to the spike strip. I think it's clear from the government briefing in Rodriguez-Martinez that that was a separate incident where the vehicle traveled over the spike strip, then rolled over, and then someone was injured. Well, we can ask the government about it. All right. And anyway, it's important to understand – and this is going back to the government's and or waived bringing the border search doctrines into this case. Why – that's obviously an important point, and it's one that concerns me a lot, because if this is a border search, it makes the government's burden a bit lighter. It's true that that doctrine was not invoked before the district court, but what facts were missing that would have made it different? How would the hearing have gone differently if the government had said, quote, border search, close quote? I'd be happy to address that, Judge Fogel, but I think, first, even if it is a border search, even if we agree that this is an extended border search or the functional equivalent of a border search, and I have arguments and reasons why I think that's not the case, we already have an analysis. Even when you're at the border itself, where the government's powers were – it's Zenith, to use the Supreme Court's phrase. We have an analysis for whether a detention rises to the level of an arrest that is clearly an arrest in this case, and that comes from this Court's decision in Gravo and other cases such as the Juvenile Case, RRA. And the two standards that the Court has announced is, first, is the detention more than a temporary detention occasioned by border-crossing formalities? Well, certainly when you're spike-stripped on the side of a highway without being given any warning and your car is disabled and all of your tires are blown out, that's not a border-crossing formality. But however we define that term, which wasn't defined in Gravo, it's certainly not a temporary detention. And even at the border, if the detention is more than temporary, we have a situation where you're under arrest. Gravo articulated the standard differently. It said the other way you can look at this is whether a reasonable, innocent person in such circumstances would conclude that, quote, after brief questioning he would not be free to leave. Well, certainly in this case, had the officers done what they did, Mr. Okoda was unable to be free to leave. He was dozens of miles in the desert away from the closest town. Two of his tires had been blown out, and the agent himself testified it would not be safe to drive his car even if you could at that moment. So I think under the standard that's been articulated, not in an extended circumstance or the functional equivalent, under that standard we have an arrest. So I think we – I think the court does have to reach that. Yeah. I wondered about that, Mr. Townsend, because you could, I suppose, lay out the strip spikes or whatever they were, and it stops the car. The officer goes up and he finds nothing in the car. He searches and talks to the fellow or whatever. And he says, well, I didn't find anything. You're free to leave. And the guy says, what do you mean free to leave? I can't drive my car. And the officer says, well, you're free to go. Call anybody you want. And I suspect he is free to leave, although as a practical matter you're going to have to call the auto club or you're going to have to do a lot of things in order to get away or leave. Or you could walk away, I suppose, if you were. But even so, the car has been damaged. But what does that have to do with whether he was really free to leave? I mean, he was free to leave. Well, I think we do have to look at each case with the specific facts. And I don't think this Court today would have to hold that any time that this happens that it necessarily the person isn't free to leave. If it happened in an urban area, which I would hope it wouldn't. I mean, I am here today to say that spike stripping is dangerous. I think we have evidence of it here in the record. Sure. But certainly in a case, and the record is well developed. We're at least 15 miles away from Calexico to the west. We're at least, I think it's 10 or 12 miles from the Winter Haven exit, which could be even further than the town, to the east. And we're in the middle of the desert. And it's multiple tires being blown out. So there's not this sense that you can just throw a spare on. You really are left there. So I think it would be unfair in this case to say that you are free to leave. The government, maybe he's free to leave, but the government has taken away his access to leave, and so has precluded him from leaving, I guess is what you're arguing. Well, the question is, would a reasonable person feel free to leave? And I think under these circumstances, no, the reasonable person wouldn't feel free to leave. Not in this case, because he found all of the drugs in a car. Well, certainly not in this case. But the test is for the reasonable, innocent person. And I think even in that case, that person would not be free to leave. I'm running out of time. I'd be happy to answer any questions regarding probable cause or the other issues. I have a minute for rebuttal. Go ahead. Good morning, Your Honors. May it please the Court, Mark Ray for the United States. The first issue I'd like to address is the one that was addressed first by my opponent. And I don't believe it provides any reason to defer this case or to get supplemental briefing or anything of that matter. As Judge Thompson pointed out, Agent Battaglini testified below, and it's in the case he's talking about, it's in the Vasquez, Ramirez excerpts of record, that there was one accident that he has witnessed before. And, in fact, I have it here. V.E.O.R., page 126. And he says, He swerved as I deployed the control tire deflation device. He began to swerve. He ran over the device, continued swerving, and the vehicle rolled over. There was never any attempt to hide this information, Your Honor. The district court had that before it went and made its decision. But what is the point that still remains despite this admission? It's simply that in 100 uses of this device by Agent Battaglini, in that case, there's never been one accident. The government's never denied that. But when you look to the object of reasonableness of the police use of force in this case, the law is clear. It's a balancing test. And it doesn't have to be that we disprove every single possible scenario. If the evidence here before the court, and it was extensively litigated, is that these devices are safe, they have a good track record. I mean, the case that you're going to hear after this one and this one, Agent Begatora's testified in the Cotamora case that in 150 uses, he's only witnessed one accident. And then you have Agent Battaglini testifying in the next case that in 100 uses, he's only had one accident. I think the district court is within its rights in concluding that that militates towards a finding of reasonableness. Now, the light and siren, if he puts that on, there was testimony that I don't think it was in every case that the suspected violator, we'll call him, runs away, goes to high speed. It wasn't in every case, but it was in most cases. What was that evidence? It's a little both, Your Honor. I'm glad you asked that question. In Cotamora, Agent Begatora has testified that he has made, he's been involved in, in one way or another, either as the arresting officer or as an assistant in narcotic apprehensions in the Imperial Valley area. He said of those, 150 involved the use of spikes, so that's 75%. Now, the defense would have you believe, well, therefore, there's 25% where people did yield. But the question was, when he testified in that niche, he was speaking generally at another point of the record, and this is an excerpt of record, the second volume, page 67. He testified, at this area, the Buttercup Campground, and topography is key in this case, as Your Honor can tell from the, at least that's the government's position from our brief. He has arrested 50 to 60 smugglers that have come out either the Buttercup Valley or the A7 Valley into the Buttercup Campground. In an excerpt of record, volume two, pages 81, he says on direct, and he reaffirms on cross at 83, every single car that he has ever lit up with lights and sirens coming out of the Buttercup Campground has failed to yield. And I think that's. Every car? Every car that he's attempted to light up. Yeah. So, when you look at the, and the Supreme Court says in Ornelius v. United States, when looking at these questions, you have to give deference to the observations of officers in light of their experience. This is specific experience geared to this small corner of the earth that the agent's talking about. And I think that's compelling evidence. And even aside from that testimony, he testified in excerpt of record pages 79 and 80, that failures to yield are common in the Imperial Sand Dunes. And in fact, he used to quote, he has numerous times been involved in situations when vehicles crossed lanes of traffic on the freeway and jumped the median. But this issue about the preemptive use, I think this is really what these cases come down to. Because one thing I was going to come up here on the issue of suspicion, I will assume that the cause is probable cause. That's the standard. That evidence is here in spades. And I will discuss that briefly. The evidence on this case. May I, before you go there, can I just ask you about the, back on the reasonable force question. Is there any evidence in the record as to false positives with the spike strip? In other words, of the 150 cars that were stopped in that manner, were any of them found not to be containing contraband? There was no evidence of that. There's no evidence one way or the other? Well, actually, there's evidence the other way. I know that in the Vasquez-Rosales case, Agent Vallinini testified that every case that he has used spikes on, there has, in fact, been drugs or somebody connected with the conspiracy. And there was never any evidence of any false positives. This is just following up on Judge Thompson's question earlier. If they somehow got a false positive, would the CHP call the AAA or would they take the person to the nearest town or what? I mean, when you picture somebody being out in the desert at 120-degree heat, you know, it is, yeah, you're free to leave, but good luck getting anywhere. So we don't have any evidence or any indication at all with regard to that. Not in the record, but not as to what would happen in the case of a false positive. Again, I think it is important, and it's important to note, you're going to hear two cases this morning involving three defendants. That's three separate lawyers, months of litigation. Not one incident did they ever do to show as much. But Agent Vallinini testified, on the other hand, as I pointed out, that he has never spike-stripped a car without there being drugs. And I understand, you know, sometimes just because it turns out that the results are right, that shouldn't always justify, but it's definitely a factor. If I would have come here in this third month of the existence of these spike-strips and tried to tout their virtues, as the defense claims I do, I'm sure the first question would have been, well, what's the track record? How many times has this been used? And that's why this evidence was put out in great detail before the district court. And not just as far as the track record, but the design itself. Because even maybe to somebody who doesn't know about these cases, the intuitive response, spike-strip, you hear the word spikes. You think maybe there's some rusty nails on a strip, and it's going to cause a blowout or an explosion. In both the cases this morning, testimony is 180 degrees the other way. Each of the test-flying officers testified that tires do not immediately blow out. In the Cotamore case, you'll find that in excerpt of record, page 76. And in fact, Agent Vega-Torres was somewhat of a unique witness in this regard, because he accidentally has run over one himself. And as he testified, it's like driving over a little bump on the road. And as he testified, it's like driving over a little bump on the road. And as he testified, it's like driving over a little bump on the road. Except your tire is deflating. Exactly. But the question is, is it excessive force or not? And he said, I still could retain control. He testified consistent with Agent Badalini in the other case, this has meant it's a two-inch hollow steel spike. It slowly deflates the air. It's not about an explosion. And drivers, in fact, in both of these cases, they were able to continue another half-mile down the road, and there were no accidents, no rollovers. I mean, it's somewhat unusual to have an excessive force case where there's no harm. I interrupted you. You were starting to talk about probable cause, and I'm sure all of us are interested. Oh, no worries, Your Honor. I'll come back to that. In this case here, what is the evidence? And, again, I'm saying I will assume that that's the standard. Imperial Sand Dunes, without a doubt, an area notorious for smuggling. In this case at Cotamora, two agents testified, Agent Harrington. In four years, he's had 40 arrests, totaling 40,000 pounds of marijuana. Agent Vegator has testified five years, he's had 50 to 60 arrests. But beyond that, one of the most critical factors here is that they, these agents had almost an absolute certainty that these vehicles had just crossed the border. And this is why I went to the detail about the topography in our case. This is out in the middle of nowhere. These two valleys, the Buttercup Valley and the A7 Valley, there's undisputed testimony. They're flanked by 200 to 300-foot sand dunes on each side. The only place an unmodified SUV can travel is through these valleys. And in both cases, you have constant surveillance for hours ahead of time. In fact, in Cotamora case, the agents testified there was an eight-hour shift the night before, reported no vehicles in the area. When Agent Vegator's came on duty, he himself personally drove and confirmed that there were no vehicles. The only people that they saw were a construction crew. Also, keep in mind, this was in the Cotamora case, June 14th, in the Imperial Valley. It's 110 degree heat, oppressive. And the agents testified, this time of year, all the off-roaders come in the winter. Here, there's absolutely zero traffic. And so what happens after six hours of surveillance? Suddenly, two ATVs appear. And this agent testified, again, I'm bringing back to the Ornillo's point, Supreme Court says you have to look at this evidence in the light of their experience. These agents are familiar with the modus operandi of these drug smuggling organizations. Agent Harrington testified at Exchequer Record 22, or I'm sorry, 37, every time he's seen a vehicle immediately preceded by the presence of a scout, there have been drugs in the car. These two ATVs show up less than five to six minutes later, along comes the defendant's vehicle. It's unmodified. There's never been any evidence in the record that it had special tires or lifted suspension. So from that testimony, it's a near certainty that that car crossed the border. In a United States v. Hernandez-Garcia, this case eight years ago, specifically held that was all you needed for probable cause. And I'm also glad my opponent brought up the Rodriguez-Martinez case. That was a month ago. Judges Hall, Silverman, and Callahan relied on Hernandez-Garcia to say the fact that the agent saw the vehicle cross the border out in the middle of nowhere, other than at a designated point of entry, was itself probable cause to justify the stop. But here in this case, it doesn't even stop there. In the Kodemore case, the vehicle's not bearing any orange or red safety flag, which is required by BLM regulations for off-roading vehicles. It doesn't act like a typical off-roading vehicle. It makes a straight line for Interstate 8 and immediately gets on the freeway. And again, Agent Harrington testified at Executive Record page 22, every one of the 40 cars that he's previously been involved in the apprehension of that behaved in that manner, came in an unmodified car out of these valleys, going straight into Interstate 8, had drugs. And on top of it, this car was missing its front passenger seat and it had something in it, and he was in an elevated position using binoculars. And I know the defense tried to cast aspersions on his credibility about the tinted windows and one of the officers said you couldn't see him. That other officer was looking inside. If you look at the picture of the vehicle, even in their excerpts of record, the front windshield doesn't have that kind of tinting. Plus, Agent Harrington is in an elevated position with binoculars. All of this information, again, Your Honors, Hernandez-Garcia says all you need, crossing the point, not a designated port of entry, and acting like you're in a hurry. You have that in spades here. So even if you don't want to reach the border search, you don't have to. You can hold us to the high standard. Roberts. The Rodriguez-Martinez at a memorandum disposition? Yeah, the one from a month ago, this, yes. But again, Hernandez-Garcia, obviously, that is the published one from eight years ago. And I see I'm out of time. I think I'm going to be arguing the next case as well. So unless the Court has any further questions on this one, I will submit. All right. Thank you. I can just make two brief points. The first goes to the excessive use of force or whether the stop was reasonable. The analysis this Court has to perform, no matter how many false positives there were or were not, no matter how many times the agents found drugs in cars that they had crossed before, is an individualized analysis. The Supreme Court has said in Graham that you look at three factors, the severity of the crime at issue, if it's a crime involving violence or a threat of violence. Two, whether the specific person, the suspect, poses an immediate threat of safety to officers or others. And again, whether that specific suspect is actively resisting arrest or attempting to evade arrest by flight. None of those have been demonstrated here. The agent was very candid when he said, I do not know if Mr. Cody Moore would have stopped when I lighted him up. As to the probable cause, there are numerous facts that I could debate if I had more time, but I will end with this. The prosecutor asked the judge to find probable cause on those facts. The judge who heard the testimony from the agents in this case, and he declined to find probable cause based on those facts. If this Court carefully compares this case to Hernandez-Garcia, there are numerous other facts that Mr. Rahe did not point to that established probable cause in that case. They're not here, and for that reason, I believe the Court should reverse. Well, was it established that the route your client's vehicle took was a route that was used commonly by smugglers? Your Honor, to be clear, Mr. Rahe has talked about the geographical location here. This is a public and very popular campground, a recreational campground, where people do travel all the time. But where these folks were first spotted, where were they? They were in the Buttercup. There's a campground. I'll try to explain it without that. I've got a picture of it here. There's a cul-de-sac, as Your Honor is looking for the picture. There's a cul-de-sac area, and when people camp, they camp around the cul-de-sac and along a camping area on the side, I believe, to the east. And then the dunes rise up, and the Buttercup Valley is basically the valley that comes in to the campground area. So he sees the ATV. From which direction did this vehicle come from? Conceitedly, he saw this vehicle coming from the south out of the Buttercup Valley. What I would say to the Court, and again, I don't want to spend too much time, is that the agents testified, this is a car with California plates. And they said that you can drive along the border road all the way from Calexico, and when you get to the Buttercup area, if you make a minor detour around one of the larger dunes, and this puts you into Mexico, but there's no signs, there's no fence,  so it is quite possible, equally possible, maybe even more possible that a car with California plates had been driving along that road and came out through the valley. It's simply, there's not probable cause, and to the extent that the government has to show reasonable certainty that this car was coming into the United States intentionally, I cited the 11th Circuit case Garcia that said if you started a point in the United States and ended a point in the United States, it's not enough that you had gone out over international waters to fly back in. And I also will cite to this Court's decision, and I believe it's Cacaban or Cabacan, sorry, and that was an en banc decision in which the Court said that you cannot have an importation offense when someone takes off from a U.S. territory, I think it may have been Guam in that case, and land somewhere in the continental United States. I can't remember exactly where. So I think that there's quite a possibility there and a probability that this was not an illegal entry that the agents wanted to believe it was. Thank you. Well, weren't there, the route that they took, there were no real obstacles, were they, to coming from Mexico into Buttercup? The agents testified that a car, unmodified for any particular dunes activity, could travel from Mexico into the United States. Just as he testified, a car with no modifications could travel along the border road, go around the dunes and back into the United States. Well, didn't the agents make some observations of the vehicle? There was Agent Harrington who was positioned across the highway who saw the vehicle come out of the campground area. He testifies that he was able to see into the passenger side area and he believes he saw something. He called it something. The government, in their brief, using a passive voice, says that his experience told him that it must be drugs. But he saw something. The dispute, and I was the lawyer at the evidentiary hearing, the dispute was whether he really could see what he claimed to have seen because the agent who actually arrested Mr. Cota, Agent Vega Torres, he testified that when he was driving, he couldn't see into the vehicle. And even when he walked beside the vehicle, he couldn't see into the vehicle to see anything. He said he had to open the door. And at that moment, that was the first moment that he could see anything in the car out of the ordinary. Well, was the other agent at the high ground, so to speak? Another problem in this case, it wasn't raised in the brief, is that the vehicle was either sold or destroyed before the defense had an opportunity to view it. The only photographs I had were, I believe, four photographs taken by the government agents before they disposed of the vehicle. I can't say with certainty what the angle of Agent Harrington would have to say, but if he was higher, he would have less of a view into the vehicle. I certainly do have the pictures that we were fortunate to get from the government to show the tinting on the window. Did he have binoculars? He testified he had his binoculars, and I have no reason to doubt that. The question is, what could he see from a heightened angle across the highway into this vehicle? It's unclear, Your Honor, in where the government has to demonstrate probable cause and where the government asked the district court to find probable cause on these facts. I think it's telling that the court declined to do so. Well, you know, the line between probable cause and reasonable suspicion is sometimes difficult to draw. I agree, Your Honor. It is hard to determine, but there was an easy solution in this case for Mr. Koda. They could have used the exact same techniques that they had. They could have laid out a spike strip ahead of him and still tried to use lights and sirens to see if he would pull over. And if he didn't, then maybe the spike stripping would be justified. Maybe there would be an indication of flight. There was no reason and nothing offered in the record why they had to spike strip him without giving him the opportunity to pull over. Mr. Ragey said that they could have tried to turn around on the road. The officers could have been prepared for that situation. Well, wasn't there some discussion or some evidence that was introduced that by turning on the lights and the siren that the suspect vehicle would attempt to flee? That there would be a chase and others using the highway would be in danger? Mr. Ragey will correct me if I'm wrong, but I believe what the record reveals is that when asked if any car had yielded coming out of the Buttercup Valley, the officer said no. But what we also know from this particular case is that they had a plan in practice where they spike stripped every car that came out of the valley. At least in Mr. Koda's case, it's not clear that every car that had come out of the valley was spike stripped. And as far as I can recall, and I don't have the excerpt before me and I apologize, there's no indication that people had been lighted up and never pulled over. But still, we have the test that's been provided. Well, there's certainly a risk of that. Your Honor, there's always a risk that an individual will not yield to authority in numerous circumstances. But when we start using spike strip devices that are destructive, where we can see that they do cause injury, and I will posit that Agent Vega, Mr. Ragey cited to the other case for getting ready to argue Guzman-Padilla, Agent Vega said it was a van and that it swerved before it went over a spike strip. I'm not sure whether he's talking about the same one or not, but certainly his testimony that the Court had to rely on in our case and what appears from the government's brief in the Rodriguez case is at a variance. But it is a dangerous situation. I cited to the Seventh Circuit decision where two people, two innocent motorists were killed. And in Ms. Tricotta's case, the government quibbles with me on this, but the Court can read the record. Ms. Tricotta was in the slow lane when he hit the spike strip, and he veered over into the center median. There's no wall there, and it would have been very dangerous for him to go into incoming traffic. But Agent Vega said, you know what? This has happened before. Even if the government says, you know what? There's no direct evidence that he veered. Agent Vega said, look, that spike strip is somewhere before. They went over the center median, and they went into incoming, oncoming traffic. A very dangerous situation. Agent Vega. These officers were at a cab drive. Yes, Your Honor. And they could observe vehicles coming into the cab drive. Yes, Your Honor. There was, Agent Harrington wasn't there the whole time. He was relying on what had been relayed to him before. They had had agents what they call sweep the border previously to see if there were any tracks in. And when Agent Harrington arrived, he didn't notice any traffic there. I think he saw some construction trucks and some, there were people in the area, but no one he believed to be a recreationist. Were the vehicles required to, that were there for recreational purposes, required to fly a red flag? There is a Bureau of Land Management regulation, but I believe it was Agent Harrington testified they don't always fly the flag. That was not an uncommon instance. I don't think the flag alone would be reason to spike strip someone without trying to pull them over first. But the vehicle that your client was in had no red flag. That's correct, Your Honor. And had that vehicle been stopped at some earlier time? Absolutely. This is one of the reasons why if we were going to find out, if we were going to inquire into whether this is the functional equivalent of the border, it couldn't be. The test is the first practicable opportunity to pull over a car. Mr. Ray here, the government characterized the campground itself as a choke point. And we have testimony of agents on either side of the campground and at the campground who could have effected an arrest. It would have been very easy to do it there. It could have been done on the entry ramp to the highway. Justice Ginsburg, in the Scott v. Harris case, says you do have to look to see if there was a more reasonable and less intrusive means of effecting a stop when we get to whether there's excessive force. And I think that that's the case. It's not is there any possible way that you could stop someone with less force. But here we have a clear, obvious place to do it, right there in the campground area, right there on the entry ramp. Instead, they allowed a car to reach highway speeds 10 miles onto the interstate. And in this case, there was traffic around them. There was at least a semi-truck as well as another car. And he was allowed to enter into a dangerous situation. I think that they should and could have. In fact, Agent Harrington said, I have arrested people there at the campground area and I can do it. What did he say? Agent Harrington, the testifying agent about what he saw at the campground. Yes. He says, I have arrested people at the campground and I can do it. So there's not an issue about whether it could be done or whether it has been done there at the campground instead of with spike strips on the interstate.
judges: Pregerson, Thompson, Fogel